# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS C. EDWARDS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 18-1077 |
| | : | |
| EQUIFAX INFORMATION SERVICES, LLC, | : | |
| Defendant. | : | |

**McHUGH, J.**                                                                                    June 20, 2018

## **MEMORANDUM**

This action arises under the Fair Credit Reporting Act (FCRA). Plaintiff Thomas Edwards is a Pennsylvania resident who initiated this action in state court, alleging that Defendant Equifax violated FCRA by failing to provide contact information for entities that accessed his credit information. Equifax removed the case, and now seeks to transfer it some eight hundred miles south to the Northern District of Georgia, where it is headquartered. In *Jumara v. State Farm Insurance Company*, 55 F.3d 873 (3d Cir. 1995), the Third Circuit instructed district courts to consider the "interests of justice" in deciding motions under 28 U.S.C. § 1401(a). Given that the FCRA is remedial legislation, *Cortez v. Trans Union, LLC*, 617 F.3d 688, 722 (3d Cir. 2010), this is a motion that has significant implications for consumers' access to the courts. If Defendant's reasoning is adopted, virtually any FCRA plaintiff could be forced to bring claims in a district far from home, a burden that would inevitably undermine enforcement of federal consumer protection laws under the system of private litigation that Congress sought to incentivize. For that reason, and others that follow, the Motion to Transfer will be denied.

1

## I. Motion to Remand

As a preliminary matter, I must address Plaintiff's Motion to Remand to State Court on the basis that removal was untimely. The Motion will be denied, as Equifax filed its notice of removal within thirty days of being served with the complaint. Under Pennsylvania law, a plaintiff may initiate an action by filing either a praecipe for a writ of summons or a complaint with the prothonotary. Pa. R.C.P. 1007. Plaintiff initiated this litigation by filing a praecipe for writ of summons with the Bucks County prothonotary on August 2, 2017. But Plaintiff did not file his Complaint in the Bucks County Court of Common Pleas until February 22, 2018, Pl.'s Ex. G, ECF No. 10-7, serving Defendant's counsel on February 26, 2018. Pl.'s Ex. H, ECF No. 10-8. Defendant then filed its notice of removal on March 12, 2018, well within thirty days of service. Pl.'s Ex. I, ECF No. 10-9.

For some period of time, the Third Circuit considered service of a writ of summons writ an "initial pleading" for purposes of triggering the time for removal under 28 U.S.C. § 1446(b)(1). *Foster v. Mut. Fire, Marine & Inland Ins. Co.*, 986 F.2d 48, 54 (3d Cir. 1993). In 2005, however, the Third Circuit concluded that *Murphy Brothers v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999), had implicitly overruled *Foster*, holding that the "literal wording of *Murphy Bros.* requires the filing or receipt of a *complaint* before the 30-day period begins." *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 221 (3d Cir. 2005) (emphasis in original).

Here, the notice of removal was filed well within the applicable time period, rendering Plaintiff's Motion meritless.

**II. Motion to Transfer Venue**

Having found that federal jurisdiction exists, I will now consider Defendant's Motion to Transfer Venue under 28 U.S.C. § 1404(a). Equifax argues that the Northern District of Georgia provides a more convenient venue for the adjudication of this dispute. Because Equifax is headquartered in Atlanta, Georgia, venue there would be proper. In support of transfer, Equifax asserts that it adopted the policies giving rise to Plaintiff's claims at its headquarters, and that all documents, data, and witnesses pertinent to the claim are also located there. Assuming for purposes of discussion that all of that is true, I nonetheless find the argument for transfer unpersuasive.

Under § 1404(a), district courts are to consider the "convenience of parties and witnesses," and "the interest of justice." Within the Third Circuit, the classic formulation of the analysis under § 1404 is set forth in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995), and involves a series of private and public interest factors. Private-interest factors include (1) the "plaintiff's forum preference as manifested in the original choice," (2) "the defendant's preference," (3) "whether the claim arose elsewhere," (4) "the convenience of the parties as indicated by their relative physical and financial condition," (5) "the convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora," and (6) "the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Id.* Public factors include: (1) "the enforceability of the judgment," (2) "practical considerations that could make the trial easy, expeditious, or inexpensive," (3) "the relative administrative difficulty in the two fora resulting from court congestion," (4) "the local interest in deciding local controversies at home," (5) "the

public policies of the fora," and (6) "the familiarity of the trial judge with the applicable state law in diversity cases." *Id.* at 879–80.

As a preliminary matter, it bears mention that *Jumara* was decided well before the era of e-commerce. This case involves economic activity that traffics in data over the internet as compared to physical things. Credit reporting agencies like Equifax operate nationwide, gathering consumers' personal information, which they then analyze, package, and sell. Unlike traditional commercial transactions, consumers do not in the first instance seek to contract with credit reporting agencies. The agencies operate in the background, gathering information on their own. In practical terms, the relationship is created unilaterally, and consumers such as the plaintiff here must react to the activities of the credit agencies. Information may be gathered centrally, but the effects of its disclosure are diffuse. This makes the *locus* of a dispute much harder to identify, and the nature of information-based commerce renders some of the concerns addressed by *Jumara* less pressing. It was the unique nature of the credit reporting industry led Congress to enact FCRA, recognizing the need for a national standard for regulating the relationship between credit reporting agencies and consumers.

The Supreme Court has described the statute as follows:

> FCRA creates a detailed remedial scheme. Its provisions "set out a carefully circumscribed, time-limited, plaintiff-specific' cause of action, and 'also precisely define the appropriate forum." . . . Claims to enforce liability must be brought within a specified limitations period, § 1681p, and jurisdiction will lie "in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction."

*United States v. Bormes*, 568 U.S. 6, 15 (2012) (quoting *Hinck v. United States*, 550 U.S. 501, 502 (2007); *see also* 5 U.S.C. § 1681p. Against this background, rote application of the *Jumara* factors might not encompass all of the relevant considerations. The factors must be considered, but part of that consideration necessarily includes how well the factors fit the circumstances of

4

the case before the court. Such a broader approach is specifically endorsed by *Jumara* itself, where the Court held:

> In ruling on § 1404(a) motions, courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum."

55 F.3d at 879 (quoting 15 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3847 (2d ed. 1986)).

Turning first to the *Jumara* factors, Plaintiff's initial choice of forum weighs heavily in favor of keeping his case in this district. As the Third Circuit has explained, "It is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice 'should not be lightly disturbed.'" *Id.* at 879 (citing *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970)). Transfer "is not to be liberally granted," and should not occur "unless the balance of convenience of the parties is strongly in favor of defendant." *Shutte*, 431 F.2d at 25. That preference is entitled to even greater deference "when the plaintiff has chosen the home forum." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981).

Here, Plaintiff has expressed a clear preference to litigate this action near his home in Pennsylvania. Equifax disputes this, arguing that because Plaintiff was removed to the Eastern District from Bucks County, he cannot be deemed to have chosen this court as the forum. This is wordplay, not serious legal analysis, because such a definition of forum is so myopic and artificial as to render the concept meaningless. Plaintiff's original choice of Pennsylvania as the forum is not extinguished by a subsequent involuntary removal. The Eastern District of Pennsylvania is equally a "home" forum to a Bucks County resident as the Court of Common

5

Pleas. And, by definition, Plaintiff's opposition to the Motion to Transfer to Atlanta expresses a clear preference for Pennsylvania as the forum.[1]

The second *Jumara* factor—the defendant's preference—in reality does little more than frame the issue, because there would be no motion to transfer *unless* the defendant prefers a different forum. The essential question is whether a combination of other factors are sufficient to overcome the presumption that the plaintiff's preference governs. As the *Jumara* Court made clear, "[t]he burden of establishing the need for transfer still rests with the movant." 55 F.3d 879 (citing *Shutte*, 431 F.2d 22, *cert. denied*, 401 U.S. 910 (1971)). Significantly, transfer is not warranted where the effect would be to shift inconvenience from defendant to plaintiff. *See Shalu Punoose v. Equifax Info. Serv., LLC*, 2018 WL 2735403, at *2 (E.D. Pa. 2018) (Joyner, J.); *EVCO Tech. & Dev. Co., LLC v. Precision Shooting Equip., Inc.*, 379 F. Supp. 2d 728, 730 (E.D. Pa. 2005); *Perry v. Markman Capital Mgmt., Inc.*, 2002 WL 31248038, at *9 (E.D. Pa. 2002).

The third *Jumara* factor, which considers where the claim arose, defies easy definition in cases that center on the business of data aggregation and transmission. Defendant seeks to define the issue in terms of physical location, arguing that its reporting policies are formulated at its headquarters in Atlanta, and applied to individual consumers such as the plaintiff by its employees working there, and that the data they gather is stored on computer servers located there. Offsetting these considerations is the fact that credit reporting agencies gather data nationwide. This dispute originated with an inquiry from a consumer in Pennsylvania, and any effects of a statutory violation would be felt in Pennsylvania. Indeed, part of the dispute in this case is that Plaintiff, having checked his credit report, knows that certain entities made inquiries

---

[1] In that regard, Congress specifically created jurisdiction over FCRA claims in both state and federal courts. To hold that a plaintiff whose case was removed to federal court thereby forfeits the right to litigate in his home state because he initially filed in state court—effectively penalizing him for that choice—would both be inconsistent with the statute and raise serious issues of federalism.

into his credit history, and even knows the end users' identities, but Equifax has refused to provide address and telephone contact information that would enable the Plaintiff to learn where such inquiries originated. It could be argued that Plaintiff initiated a relationship with Equifax in Atlanta by making his inquiry, but that inquiry was only necessary because Equifax acted unilaterally in the first instance to harvest and share Plaintiff's information. If the location from which Equifax operates was in some way related to the merits of the case, as it might be with a real estate transaction or certain kinds of accidents, its argument that the cause of action arose there would have more force. Here, it is the interaction of Equifax with third parties outside of Atlanta that is the concern of FCRA. In sum, there is no single answer to where the cause of action "arose."

The fourth *Jumara* factor directs district courts specifically to consider the respective burdens on the parties "as indicated by their relative physical and financial condition." 55 F.3d at 879. It appears from publicly available sources that in 2017, Equifax reported total revenue of $3.36 billion, with a gross profit of $2.15 billion and net income of $587.3 million. The company's total assets amounted to $7.23 billion. *See* "Equifax Inc.," D&B Hoovers, http://www.hoovers.com/company-information/cs/company-profile.equifax_inc.7add2af6d9419417.html#financials-anchor (last visited June 15, 2018); "Equifax Inc (EFX US Equity)," Bloomberg Law, Company Lookup, https://www.bloomberglaw.com/company (last visited June 15, 2018). Despite losses stemming from a massive 2017 data breach, the company has reported steady annual increases in revenue and net income in recent years. *See id.* Given such resources, particularly when compared to an individual consumer, it strains credulity to suggest that any burden of convenience upon Equifax is meaningful.

The fifth *Jumara* factor is self-limiting, in that it directs courts to consider the convenience of witnesses, but "only to the extent that the witnesses may actually be unavailable for trial in one of the fora." 55 F.3d at 879. Equifax has not identified any third-party witnesses, and it is well-established within the Third Circuit that an employer "is obligated to procure the attendance of its own employees for trial." *Coppola v. Ferrellgas, Inc.*, 250 F.R.D. 195, 199 (E.D. Pa. 2008); *Am. High-Income Tr. v. AlliedSignal, Inc.*, 2002 WL 373473 (D. Del. 2002); *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192 (D. Del. 1998). Consequently, this factor lends no weight to transfer.[2]

The final private interest *Jumara* factor requires consideration of the "location of books and records." 55 F.3d at 879. This factor has lost much of its significance in modern litigation, where few business entities retain physical archives of records. That is particularly true in the case of credit reporting agencies, where, in the Court's experience, all of the records are maintained in electronic databases. The location of computer servers housing such databases simply lacks real world significance, because document production does not involve physical search and retrieval, but electronic download. *See Lomanno v. Black*, 285 F. Supp. 2d 637, 647 (E.D. Pa. 2003) ("[T]he technological advances of recent years have significantly reduced the weight of this factor in the balance of convenience analysis."); *accord Am. High-Income Tr.*, 2002 WL 373473, at *5. Any pertinent documents are easily transmitted to this forum, not just for purposes of discovery, but for docketing and production at trial.

In short, except for an equivocal position on where the cause of action arose, Equifax cannot support a case for transfer under *Jumara*'s private factors.

---

[2] Although not essential to the analysis in view of Defendant's failure to show an inability to secure attendance of witnesses, Plaintiff will seek leave at trial to present third-party witnesses located in Pennsylvania who have been subject to similar purported violations, in an attempt to prove a willful violation. *See* Pl.'s Br. 13–14. The inability of Plaintiff to secure the appearance of such witnesses in Georgia would be a countervailing consideration.

*Jumara*'s public factors are not easily applied to a case involving a federal statute. It is readily apparent that the fourth, fifth, and sixth factors—"local" interests, policy of the forum, and familiarity with state law, respectively—address diversity cases. FCRA establishes a uniform national standard; the policy considerations are the same in every forum, and federal judges are presumed to know federal law.

Nor do the remaining three factors have particular relevance when the question is whether a case should be transferred from one federal court to another. Enforceability of a judgment is not an issue in light of 28 U.S.C. § 1963. Docket congestion is unlikely to be relevant except in districts where the Judicial Conference has identified the existence of a judicial emergency, because under the individual calendar system the pace at which a case moves is uniquely a function of the assigned judge. *See* Institute for the Advancement of the American Legal System, *Civil Case Processing in the Federal District Courts: A 21st Century Analysis* 38 (2009). But even if one changes the focus from how fast the transferred case would move forward to a more systemic comparison of districts, there is no basis for transfer here. As of March 2018, the median time to disposition for civil cases in the Eastern District of Pennsylvania is 5.8 months, as compared to 6.4 months in the Northern District of Georgia. Median time to trial in civil cases is 21.2 months here as compared to 29.6 months in Atlanta. And the number of pending cases per judge in the Eastern District is 336, well below the 561 pending cases per judge in the Northern District. *See* U.S. Courts, *Federal Court Management Statistics, March 2018*, http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-march-2018 (last visited June 19, 2018). The remaining public factor, addressing "practical considerations," is in effect a catch-all inviting the court's attention to issues not otherwise captured by the other *Jumara* factors.

9

As noted above, the limited applicability of the public factors *Jumara* specifically identified does not end the analysis. Section 1404 calls upon courts to consider the "interest of justice," and *Jumara* endorsed a broader inquiry that includes any consideration relevant to this interest. 55 F.3d at 879. In my view, in the context of a statute such as FCRA, which the Supreme Court has characterized as a "carefully circumscribed" and "detailed remedial scheme" established by Congress, district courts should not consider motions to transfer in isolation, but should also consider the implications of such transfers and whether they comport with the statutory scheme. In particular, courts need to consider whether transferring cases out of the plaintiff's chosen forum undermines the system of private enforcement Congress has established.

Private enforcement actions are an "integral component" of FCRA's "regulatory apparatus." *See* Austin H. Krist, *Large-Scale Enforcement of the Fair Credit Reporting Act and the Role of State Attorneys General*, 115 Columbia L. Rev. 2311, 2321 (2015). Indeed, in reconciling the Senate and House versions of FCRA, the Senate conferees agreed to revise its proposed remedial language in ways that would incentivize private enforcement. The Senate agreed to remove a cap on punitive damages and allowed consumer lawsuits for negligence, as opposed to "gross negligence," specifically to "provide a greater incentive for reporting agencies and users of information to comply with the various provisions of the act." 116 Cong. Rec. 35940 (1970). Additionally, the Federal Trade Commission (FTC), the agency tasked with implementing the law, has long recognized the importance of private enforcement, which it regarded as "critical to the enforcement of legislation such as this which involves literally millions of individual consumer transactions." The FTC has acknowledged that it "simply cannot investigate every possible violation of the rights to be granted by [FCRA]." *Fair Credit Reporting Amendments of 1975, Hearings before the Subcomm. on Consumer Affairs of the S.*

*Comm. on Banking, Housing and Urban Affairs on S. 1840*, 94th Cong. 14 (1975) (statement of Christian White, Assistant Director for Special Statutes, Federal Trade Commission). In that respect, private actions brought by individual consumers are not local controversies in the ordinary sense, because cumulatively, each such action plays a role in the regulatory scheme.

Since 1970, Congress has amended FCRA to further incentivize private enforcement. Under the statute's original language, which provided recovery only for actual and punitive damages, the potential recovery for many violations was too low to incentivize consumers to bring lawsuits. *See* Sheldon Feldman, *The Fair Credit Reporting Act—From the Regulators['] Vantage Point*, 14 Santa Clara Lawyer 459, 482–85 (1974); 15 U.S.C. § 1681n (1970). Consequently, in 1996, Congress amended FCRA to establish minimum statutory damages of $100 to $1,000 for willful violations, demonstrating lawmakers' recognition of the importance of private enforcement. *See* Pub. L. 104–208 § 2412, 110 Stat. 3009, 3009–446 (1996) (amending 15 U.S.C. § 1681n).

In sum, in both passing and later amending FCRA, Congress has consistently sought to incentivize private enforcement, and transfer of a consumer's action to a distant forum is by its very nature a distinct disincentive. Thus, aside from the inherent weakness of a location-based approach to venue in a case involving what is, at its core, a form of e-commerce, such a result would seem to frustrate the "interest of justice" as defined by FCRA. That does not mean that transfer can never be warranted, but the fundamental presumption favoring the plaintiff's choice of forum has particular force given the purpose of the statute. Moreover, the breadth of Equifax's argument is troubling—by its logic, every FCRA case would belong in the home district of the credit reporting agency. This is a position I cannot reconcile with FCRA or §1404(a).

As is typically so with motions to transfer, both parties are able to cite a battery of cases serving as authority for or against transfer, the facts of which are analogous to this case to a greater or lesser extent. I have reviewed that precedent, but will not discuss or seek to distinguish individual cases in detail, as it appears that none of the opinions cited include a discussion of the nature of FCRA and its implications in deciding motions under §1404(a), which is critical to the result I reach here.

## III. Conclusion

Defendant timely and properly removed this case, so the Motion to Remand will be denied. Defendant's Motion to Transfer will also be denied. Defendant has not shown that the balance of convenience "strongly favors transfer," as required by *Shutte*, and after consideration of the interests of justice as part of *Jumara*'s private and public factor analysis, I conclude that FCRA's remedial purpose would be undermined by transfer.

    /s/ Gerald Austin McHugh
United States District Judge